UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WOLVERINE WORLD WIDE, INC.,
   Plaintiff/Counter-Defendant,

                  No. 1:07-cv-1229

-v-

                  HONORABLE PAUL L. MALONEY

CAMS, INC., d/b/a BOOT CONNECTION,
a Wisconsin corporation, and
BRIAN CAMPBELL, in his individual capacity,
and SCOTT CAMPBELL in his individual
capacity,
   Defendants,
and

CAMS, INC., d/b/a BOOT CONNECTION,
a Wisconsin corporation,
   Defendant/Counter-Plaintiff
   Third-Party Plaintiff,

-v-

HARLEY-DAVIDSON, INC.
   Third-Party Defendant.

## OPINION AND ORDER GRANTING HARLEY-DAVIDSON'S MOTION FOR SUMMARY JUDGMENT

This matter comes before the Court on Third-Party Defendant Harley-Davidson's motion (Dkt. No. 82) for summary judgment. Third-Party Plaintiff CAMS, Inc. filed a response. (Dkt. No. 89.) Third-Party Defendant Harley-Davidson filed a reply. (Dkt. No. 94.) Having read the third-party complaint, the motion, briefs, exhibits, attachments and relevant legal authority, the Court finds no need for oral argument to resolve the disputed issues. *See* W.D. MICH. L.CIV.R. 7.2(d).

I. BACKGROUND

Third-Party Defendant Harley-Davidson (Harley-Davidson) manufactures motorcycles and owns the Harley-Davidson brand and insignia. In March 1998, Harley-Davidson entered a licensing

agreement with Plaintiff Wolverine World Wide (Wolverine) to manufacture and sell footwear using the Harley-Davidson brand and insignia.  In September 1998, Defendant/Counter-Plaintiff CAMS, Inc. d/b/a Boot Connection (CAMS) executed a New Account Form through which Wolverine authorized CAMS to sell Wolverine manufactured Harley-Davidson branded footwear.  Defendants Brian and Scott Campbell co-own CAMS.  CAMS sold Harley-Davidson branded footwear out of its store in Milwaukee, Wisconsin and at various motorcycle rallies around the country.

In the summer of 2006, CAMS began preparing for the Harley-Davidson 105th Anniversary Rally, which would occur in the summer of 2008.  Scott Campbell offered the owner of property in Milwaukee, Wisconsin $40,000.00 to lease a parking lot for the ten days during which the rally would occur.  (S. Campbell Affidavit ¶ 9 - CAMS Exhibit 1.)  The parking lot was next to a Harley-Davidson dealership, Milwaukee Harley-Davidson.  (*Id.*)  As a result, the owner of Milwaukee Harley-Davidson, Mr. Bob Michel, was very upset.  (John Schaller Deposition at 14 - CAMS Exhibit 8.)

In January 2007, Harley-Davidson expressed concern to Wolverine about some of Wolverine's retail accounts.  (Harley-Davidson Exhibit D.)  Mr. Hobie Burgnon, vice president of sales for Wolverine, states that Wolverine received a fax from Harley-Davidson expressing dissatisfaction with the way various retailers were distributing Harley-Davidson products. (Burgnon Deposition at 36-37 - Harley-Davidson Exhibit H, CAMS Exhibit 13.)  On the fax, under the heading "Problem Distribution - Must go away," Harley-Davidson listed five retail outlets: Leatherup-com, Meijer, Fleet and Farm, Blain Supply, Inc., and Boot Connection.  (Exhibit D.) After Boot Connection, the document stated "no sales outside of Bricks and Mortar store - no trucks to rallies - no internet sales - www.bootconnection.com." (*Id.*)  As a result of the fax, a meeting was

2

held at Wolverine where "the discussion was, these are the accounts that have been requested to be closed." (Burgnon Deposition at 40.) Those instructions, if enforced, would have prevented CAMS from selling Harley-Davidson branded footwear at rallies from tents located near Harley-Davidson dealers. (McPherson Deposition at 93-94 - Harley-Davidson Exhibit B, CAMS Exhibit 10.) At the time, CAMS was not informed about Harley-Davidson's instructions to Wolverine. (B. Campbell Deposition at 34 - Harley-Davidson Exhibit F, CAMS Exhibit 7; S. Campbell Deposition at 132 - Harley-Davidson Exhibit E, CAMS Exhibit 6.) Wolverine decided to phase out the CAMS account rather than shut it down immediately and decided to stop accepting purchase orders from CAMS at midyear. (Burgnon Deposition at 42-43.)

In the spring of 2007, preparing for the Harley-Davidson 105th Anniversary Rally, CAMS was also negotiating to lease property close to Hal's Harley-Davidson, another dealer in Milwaukee. (B. Campbell Deposition at 28-29.) The owner of Hal's Harley-Davidson, Mr. Kirk Topel, was upset that CAMS was able to secure a right of first refusal on the property for the rally. (Topel Deposition at 26-28 - CAMS Exhibit 11.)

On June 10, 2007, Scott Campbell received a telephone call from Mr. Burgnon. (S. Campbell Deposition at 49.) Scott Campbell states Mr. Burgnon told him that the Harley-Davidson people had been at Wolverine that week and had insisted that CAMS' account be taken away. (*Id.* at 50.) Mr. Burgnon testified that "we were told by Harley-Davidson Corp. that these are the accounts that needed to be closed." (Burgnon Deposition at 44.) Ms. Susan McPherson, a licensing manager for Harley-Davidson and designated spokesperson for the company in this litigation, testified the decision to terminate the CAMS account was made by Wolverine, not Harley-Davidson. (McPherson Deposition at 41, 104, and 116.)

In November 2007, Wolverine filed suit against CAMS in the Kent County Circuit Court in Michigan. CAMS removed the action to federal court. CAMS later filed a third-party complaint against Harley-Davidson. The current amended third-party complaint includes two counts. The first count alleges tortious interference with advantageous business relationships and expectancy. The second count alleges a violation of Wisconsin's Fair Dealership Law.

II. LEGAL FRAMEWORK

Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories and admissions, together with the affidavits, show there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law. FED. R. CIV. P. 56(c); *Tucker v. Tennessee*, 539 F.3d 526, 531 (6th Cir. 2008). The burden is on the moving party to show that no genuine issue of material fact exists, but that burden may be discharged by pointing out the absence of evidence to support the nonmoving party's case. *Bennett v City of Eastpointe*, 410 F.3d 810, 817 (6th Cir. 2005) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). The facts, and the inferences drawn from them, must be viewed in a light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (quoting *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). Once the moving party has carried its burden, the nonmoving party must set forth specific facts showing there is a genuine issue for trial. FED. R. CIV. P. 56(e); *Matsushita*, 475 U.S. at 574. The question is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-252.

III. ANALYSIS

    A. COUNT I - TORTIOUS INTERFERENCE

CAMS alleges Harley-Davidson, on behalf of the individual dealerships in Milwaukee who were upset that CAMS had rented space next to the dealerships, directed Wolverine to terminate its relationship with CAMS. (Amended Third-Party Complaint ¶¶ 24-25.)

Federal courts in a diversity action apply the choice of law provisions of the forum state. *Gass v. Marriott Hotel Servs., Inc.*, ___ F.3d ___, 2009 WL 510724 *4 (6th Cir. Mar. 3, 2009) (citing *NILAC Int'l Mktg. Group v. Ameritech Servs., Inc.*, 362 F.3d 354, 358 (6th Cir. 2004)); *Amerisure Mut. Ins. Co. v. Carey Transp., Inc.*, 578 F.Supp.2d 888, 897 (W.D. Mich. 2008) (Maloney, J.). A tort claim filed in a court in Michigan will be governed by Michigan law, unless a rational reason exists to use the law of some other forum. *Gass*, 2009 WL 510724 * 4 (citing *Watkins & Son Pet Supplies v. Iams Co.*, 254 F.3d 607, 611 (6th Cir. 2001)). In order to determine whether a rational reason exists to use the law of some other forum, Michigan courts perform a two step inquiry. *Sutherland v. Kennington Truck Serv. Ltd.*, 562 N.W.2d 466, 471 (Mich. 1997). *See also Williams v. Toys "R" Us*, 138 F.App'x 798, 803 (6th Cir. 2005) (explaining the choice of law analysis outlined by the Michigan Supreme Court in *Southerland*).

> First, we must determine if any foreign state has an interest in having its law applied. If no state has such an interest, the presumption that Michigan law will apply cannot be overcome. If a foreign state does have an interest in having its law applied, we must then determine if Michigan's interests mandate that Michigan law be applied, despite the foreign interest.

*Id.* (quoting *Southerland*, 562 N.W.2d at 471). Michigan courts apply another state's law where the other state has a significant interest and Michigan has only a minimal interest in the matter. *Hall v. Gen. Motors Corp.*, 582 N.W.2d 866, 868 (Mich. App. 1998).

Michigan's interest in the amended third-party complaint is minimal, while Wisconsin has a more significant interest in having its law applied. "While Michigan, a state where the injury

5

occurred, has an interest in conduct within its borders, the interest in the litigation is minimal when none of the parties is a Michigan resident." *Frydrych v. Wentland*, 652 N.W.2d 483, 486 (Mich. App. 2002). The parties to the amended third-party complaint both have a Wisconsin residence. CAMS is a Wisconsin corporation whose principle place of business is Wisconsin. (Amended Third-Party Complaint ¶ 1.) Harley-Davidson is also a Wisconsin corporation whose principle place of business is Wisconsin. (*Id.* ¶ 2.)[1] Wisconsin certainly has an interest in protecting its corporations. The conduct giving rise to the alleged tort occurred in Michigan when Harley-Davidson allegedly instructed Wolverine to terminate its distribution agreement with CAMS. However, Michigan abandoned the doctrine of *lex loci delicit*, the application of the law of the place of the wrong, in 1982. *Southerland*, 562 N.W.2d at 470-471; *Frydrych*, 652 N.W.2d at 486 (citing *Southerland*). The contract allegedly interfered with is governed by Michigan law.[2] The third-party amended complaint, however, does not raise a claim under contract law and Harley-Davidson is not a party to that contract.[3] Accordingly, Wisconsin law governs the third-party complaint.

---

[1] Curiously, Harley-Davidson's answer to this allegation states "neither admitted nor denied for Defendants are without knowledge or information sufficient to form a belief as to the truth of this allegation." (Harley-Davidson's Answer to Amended Third Party Complaint ¶ 2.) For the purpose of this motion, the Court will assume this assertion of fact most favorable to the non-moving party.

[2] Wolverine's New Account Form signed by Brian Campbell on behalf of Boot Connection includes a list of standard terms and conditions. Under the heading "Applicable Law," it states the agreement is considered to have been made in Michigan and shall be governed by and interpreted according to Michigan law. (New Account Form - CAMS' Response Exhibit 4.)

[3] Federal courts, faced with contract and tort claims in a single action, have been willing to apply two sets of state laws to different claims at issue. *See e.g., Iwasiuk v. Teleflex Automotive Group*, No. 05-60268, 2006 WL 2583118 * (E.D. Mich. Sept. 6, 2006) (O'Meara, J.) (applying Michigan tort law to the tort claims and Pennsylvania law to the contract claims because the agreement between the parties specified that Pennsylvania law would apply to their agreement).

Under Wisconsin law, a claim for tortious interference with a contract requires a plaintiff to establish five elements: (1) the plaintiff had a current or prospective contractual relationship with a third party, (2) the defendant interfered with that contractual relationship, (3) the interference was intentional, (4) a causal connection exists between the defendant's interference and the plaintiff's damages, and (5) the defendant was not justified or privileged to interfere. *Burbank Grease Servs., LLC v. Sokolowski*, 717 N.W.2d 781, 796 (Wis. 2006) (citing *Hoey Outdoor Adver., Inc. v. Ricci*, 653 N.W.2d 763, 770 (Wis. Ct. App. 2002)). Wisconsin has adopted the Restatement (Second) of Torts, sec. 766 (1979) with regard to the tort of intentional interference with performance of a contract. *Briesmeister v. Lehner*, 720 N.W.2d 531, 543 n. 8 (Wis. Ct. App. 2006) (citing *Hale v. Stoughton Hosp. Ass'n, Inc.*, 376 N.W.2d 89 (Wis. Ct. App. 1985)[4]); *Liebe v. City Fin. Co.*, 295 N.W.2d 16, 18-19 (Wis. Ct. App. 1980) (citing *Carolias Breeding Ranches, Ltd. v. FPC Sec. Corp.*, 279 N.W.2d 493 (Wis. Ct. App. 1979)). *See also Magnum Radio, Inc. v. Brieske*, 577 N.W.2d 377, 379 (Wis. Ct. App. 1998) ("Wisconsin has long adhered to the basic interference-with-contract rule of RESTATEMENT (SECOND) OF TORTS § 766 (1979)."). Under section 766, one who "intentionally and improperly interferes with the performance of a contract" may be liable. *Briesemeister*, 720 N.W.2d at 543 n. 8 (quoting *Hale*); *Liebe*, 295 N.W.2d at 19 n. 4 (quoting *Restatement (Second) of Torts* (1979)). *See also Westphal v. Smelser*, 756 N.W.2d 809, 2008 WL 2609698 (Wis. Ct. App. July 3, 2008) (unpublished opinion) ("interference alone, however, does not establish the tort; the interference must be improper" (quoting *Mackenzie v. Miller Brewing Co.*, 608

---

[4] The Wisconsin Court of Appeals noted *Hale* was abrograted on other grounds. *Briemeister*, 720 N.W.2d at 543 n. 8 (citing *Fittshur v. Village of Menomonee Falls*, 31 F.3d 1401, 1406 (7th Cir. 1994) (explaining the decision in *Kentucky Dept. of Corr. v. Thompson*, 490 U.S. 454 (1989) foreclosed the possibility that the language of the bylaw at issue in *Hale* could create a property interest protected by the Federal Constitution).

7

N.W.2d 331 (Wis. Ct. App. 2000)).

The issue presented Harley-Davidson's motion is whether its conduct was proper.[5] The defendant bears the burden of establishing a justification or privilege and that its conduct was proper, as a defense to a claim for tortious interference with a contract. *Briesemeister*, 720 N.W.2d at 543; *Wisconsin Seafood Co., Inc. v. Fisher*, 662 N.W.2d 679, 2003 WL 12271201 * 3 (Wis. Ct. App. Mar. 18, 2003) (unpublished table opinion) (per curiam). When determining whether conduct was justified or privileged, the trier of fact must consider the totality of the circumstances. *Briesemeister*, 720 N.W.2d at 543. As part of that determination, the trier of fact should consider the "nature, type, duration and timing of the conduct, whether the interference is driven by an improper motive or self-interest, and whether the conduct, even though intentional, was fair and reasonable under the circumstances." *Id. See Mackenzie*, 608 N.W.2d at 350 ("Determining whether interference is 'improper,' we consider: (a) the nature of the actor's conduct; (b) the actor's motive; (c) the interests of the other with which the actor's conduct interferes; (d) the interest sought to be advanced by the actor; (e) the social interests in protecting the freedom of action of the actor and the contractual interest of the other; (f) the proximity or remoteness of the actor's conduct to the interference; and (g) the relations between the parties.").

Harley-Davidson has established that its conduct was justified and proper. First, Harley-Davidson attempts to create and maintain a certain brand image. (Harley-Davidson Exhibit A - License Agreement ¶ 5a; McPherson Deposition at 21). The license agreement between Harley-

---

[5] Harley-Davidson argued in its motion that CAMS could not establish its claim under Michigan law. CAMS asserted in its response that Wisconsin law governed and that there were genuine issues of material fact sufficient to go to trial under both Michigan and Wisconsin law. In its reply, Harley-Davidson continues to assert that Michigan law applies, but also argues that the claim fails under both Michigan and Wisconsin law.

Davidson and Wolverine outlined Harley-Davidson's brand image and directed Wolverine to distribute goods consistent with that image.

> Licensee [Wolverine] shall develop a marketing plan for the distribution and sale of Licensed Articles in the Territory including information on each country in which Licensed Articles will be sold and such marketing plans shall be subject to Licensor's reasonable approval. . . . Licensee shall sell, distribute, supply, advertise, and promote Licensed Articles during the Term through such means as are consistent with the overall brand image established by Owner and Licensor concerning Licensed Properties. Licensee shall position the Licensed Product in the mid to upper tier of the footwear market and, unless otherwise agreed to in the marketing plan, Licensee shall sell Licensed Articles only to retailers in such channels and shall communicate such positioning requirements to its Distributors and may sell Licensed Articles through catalogs consistent with the image of the Licensee's other channels of distribution, . . .

(Exhibit A ¶ 5a.) Second, Harley-Davidson's directive to Wolverine in 2007 was consistent with its brand image philosophy. In a 2003 meeting with Wolverine, Harley-Davidson included the following under the heading "What do we want": "royalties in line with smaller volume business. No distribution in discount, farm stores or gypsy trucks. Shoes must be sold where shoe salespeople fit customers." (Harley-Davidson Exhibit C; McPherson Deposition at 64-66.) These directions promote Harley-Davidson's desired image. The document sent from Harley-Davidson to Wolverine in 2007 indicated Harley-Davidson wished to limit CAMS to selling its branded footwear at CAMS' retail store and not out of a truck at motorcycle rallies. That directive is consistent with the distribution and marketing strategy identified in both Harley-Davidson's licensing agreement with Wolverine and with the information shared by Harley-Davidson with Wolverine in 2003.

Third, Harley-Davidson's 2007 directive did not single out CAMS, but rather targeted several distributors who were conducting business in a manner inconsistent with Harley-Davidson's marketing strategy. (Harley-Davidson Exhibit D; Burgnon Deposition at 29-31.) Harley-Davidson had concerns with the distribution of Harley-Davidson branded footwear by Leather-Up, Meijer,

9

Farm and Fleet and Farm and Blain's Supply, in addition to CAMS. (Exhibit D; McPherson Deposition at 86-87; Burgnon Deposition at 31-36.) Harley-Davidson thought the sale of its branded footwear at those stores undermined the brand image it sought to create. (McPherson Deposition at 86-87.) Similarly, Harley-Davidson did not like the manner in which CAMS sold branded footwear out of tents at rallies. (McPherson Deposition at 92-93, 101, 103; Burgnon Deposition at 37-38.)

CAMS' evidence that other distributors continue to sell Harley-Davidson products out of tents and trucks does not create a genuine issue of material fact. Mr. Burgnon, who works for Wolverine not Harley-Davidson, admits seeing another distributor selling Harley-Davidson footwear from tables at motorcycle rallies. (Burgnon Deposition at 63-64.) Scott Campbell avers he has seen numerous individuals selling Harley-Davidson footwear out of tents at motorcycle rallies. (Scott Campbell Affidavit ¶ 16). Scott Campbell also avers he was told by Mr. Peter Pinacle that individuals at Wolverine directed a truck to Sturgis, South Dakota for a motorcycle rally and sell footwear at the rally. (*Id.* ¶ 14.) Harley-Davidson dealers have also sold Harley-Davidson boots out of tents at motorcycle rallies.[6] (John Schaller Deposition at 17-18 - CAMS Exhibit 8; Topel Deposition at 29-30; Sharon Greer Deposition at 26-27 - CAMS Exhibit 12.) No testimony establishes that Harley-Davidson was aware of these problems. Additionally, the testimony does not establish that Harley-Davidson singled out CAMS and improperly interfered. Harley-Davidson has attempted to manage its brand image for years. The fact that it has not successfully prevented

---

[6] From the deposition testimony cited by CAMS, it appears the dealers were setting up tents in front of their own stores during Harley-Davidson motorcycle rallies. As a temporary extension of the dealers' bricks and mortar stores, that situation is critically factually distinct from the tents erected by CAMS.

all distributors from selling its footwear from tables and tents does not undermine the conclusion that its efforts to restrict such distribution is justifiable. CAMS also asserts Harley-Davidson sold logoed items out of tents at the August 2008 rally. (*Id.* ¶ 21; Charles Hastings Deposition at 9 - CAMS Exhibit 22; Barbara Ann Krinn Deposition at 8-9 - CAMS Exhibit 15) Assuming this assertion to be true, CAMS has still not created a genuine issue of material fact. The licensing agreement, the 2003 document, and the 2007 document are specific to the distribution and placement of Harley-Davidson branded footwear, not t-shirts, hats and other logoed items.

Fourth, CAMS cannot support its assertion that independent Harley-Davidson dealers complained to Harley-Davidson about CAMS. Some of the individuals deposed recounted rumors and speculation that the dealers had caused Harley-Davidson to close the CAMS account. (Hebreard Deposition at 25 - CAMS Exhibit 16; S. Campbell Deposition at 86-90; B. Campbell Deposition at 26-29.) Both Brian and Scott Campbell conceded, as of the time of their depositions, <u>they had no first hand knowledge of such complaints</u>. (S. Campbell Deposition at 70-71, 105, 115, 117-118; B. Campbell Deposition at 33-34.) As a result, CAMS has <u>no evidence</u> to support its assertion that Harley-Davidson was motivated to restrict CAMS' distribution of Harley-Davidson footwear by any reason other than Harley-Davidson's desire to maintain its brand image. CAMS has presented evidence that two of the dealers in the Milwaukee area were upset with CAMS, but that evidence does not establish that those dealers requested some action on the part of Harley-Davidson. CAMS has presented evidence that the dealers and Harley-Davidson generally had contact with each other. (Krinn Deposition at 12-13.) However, that fact leads only to speculation that the dealers informed Harley-Davidson of any problem they had with CAMS.

CAMS' evidence that Harley-Davidson itself was upset about CAMS' decision to rent

property close to the new Harley-Davidson museum in Milwaukee does not create a genuine issue of material fact. Brian Campbell concedes that the lease to rent the property close to the museum was not signed until February 2008, more than one year after Harley-Davidson directed Wolverine to review CAMS' distribution of footwear.[7]  (B. Campbell Deposition at 23-24.)

Finally, CAMS is correct that there is a question of fact whether Harley-Davidson directed Wolverine to terminate CAMS' ability to distribute its footwear or whether Wolverine made the decision on its own. *Compare* Burgnon Deposition at 36-28 *with* McPherson Deposition at 39-41. *See also* Michael Hebreard Deposition at 20 - CAMS Exhibit 16 ("Q. But it was your understanding from the conversation that Harley-Davidson had informed Wolverine that they should not sell to Boot Connection; is that correct? A. No, not necessarily. I don't know if it was a Wolverine or a Harley decision."). This factual dispute does not create a genuine issue of material fact sufficient for CAMS to get the issue before a jury. If Wolverine and not Harley-Davidson made the final decision to terminate all of CAMS' rights to distribution, CAMS has no claim against Harley-Davidson. If Harley-Davidson made the final decision, CAMS still needs to establish the decision was not justifiable or was improper. As has already been explained, CAMS has not done so.

From the evidence presented, viewed in a light most favorable to CAMS as the non-moving party, Harley-Davidson was justified in asking Wolverine to restrict CAMS' ability to sell Harley-

---

[7] The third-party complaint alleges an agreement was reached on or about June 2007 to rent this property. (Third-Party Complaint ¶ 22c.) While an agreement may have been reached in June 2007, the lease for the property was not signed by CAMS until February 2008. There is no evidence presented that Harley-Davidson was aware of any unsigned agreement prior to January 2007.

Davidson branded footwear from trucks at rallies.[8]

### B. VIOLATION OF WISCONSIN'S FAIR DEALERSHIP LAW

In CAMS' response to Harley-Davidson's motion for summary judgment, CAMS indicates it was contemporaneously filing a motion to amend the third-party complaint to substitute parallel claims for common law and statutory conspiracy in place of the claim for a violation of the Fair Dealership Law. As a result, CAMS opted not to argue the Fair Dealership Law claim in its response. CAMS' motion to amend its third-party complaint was denied without prejudice (Dkt. No. 100) pending the outcome of the pending motion for summary judgment. Because the first amended complaint still governs the suit, CAMS still has alleged the claim.

CAMS alleges Harley-Davidson, through Wolverine, terminated CAMS' dealership agreement without good cause. (Amended Third-Party Complaint ¶¶33-40.) Furthermore, CAMS was not given the required 90 days written prior notice of the termination and cancellation of the dealership. (*Id.* ¶ 41.)

The Wisconsin Fair Dealership Law (WFDL), Wis. Stat. § 135.01 *et seq.*, seeks to protect dealers from unfair treatment by the grantors of dealerships who have inherently superior bargaining power. Wis. Stat. § 135.025(2)(b); *May v. Wheelabrator Corp.*, 811 F.Supp.416, 418 (E.D. Wis.

---

[8]This conclusion may well render the previous discussion regarding the choice of law moot. Under Michigan law, a party alleging "tortious interference with a contract or business relationship must allege the intentional doing of a per se wrongful act or the doing of a lawful act with malice and unjustified in law for the purpose of invading the contractual rights or business relationship of another." *Badiee v. Brighton Area Sch.*, 695 N.W.2d 521, (Mich. App. 2005) (quoting *CMI Int'l, Inc. v. Interment Int'l Corp.*, 649 N.W.2d 808, 812 (Mich. App. 2002) (quoting *Feldman v. Green*, 360 N.W.2d 881, 886 (Mich. App. 1984))). CAMS has not alleged any per se wrongful act by Harley-Davidson. CAMS has not established Harley-Davidson acted with any malice when it directed Wolverine to limit CAMS' ability to distribute Harley-Davidson branded footwear. Accordingly, CAMS could not maintain its tort action under either Wisconsin or Michigan law.

1993). The WFDL defines "dealership" as

> (a) A contract or agreement, either expressed or implied, whether oral or written, between 2 or more persons, by which a person is granted the right to sell or distribute goods or services, or use a trade name, trademark, service mark, logotype, advertising or other commercial symbol, in which there is a community of interest in the business of offering, selling or distributing goods or services at wholesale, retail, by lease, agreement or otherwise.

Wis. Stat. § 135.02(3)(a). The act defines "grantor" as the person who grants a dealership, Wis. Stat. § 135.02(5), and "dealer" as the person who is a grantee of a dealership, Wis. Stat. § 135.02(2). The WFDL prohibits grantors, directly or through any officer, agent or employee, from terminating a dealership without good cause. Wis. Stat. § 135.03. The grantor must also give a dealer at least 90 days' prior written notice of termination or cancellation and the written notice must state the reasons for such termination or cancellation. Wis. Stat. § 135.04.

The Seventh Circuit Court of Appeals has held the WFDL cannot be violated when the plaintiff does not have a contract with the defendant. *Praefke Auto Elec. & Battery Co., Inc. v. Tecumseh Prods. Co., Inc.*, 255 F.3d 460, 463 (7th Cir. 2001). In *Praefke*, the defendant Tecumseh manufactured small engines. *Id.* at 461. Tecumseh contracted with Industrial Engine so that Industrial Engine became a warehouse distributor for Tecumseh. *Id.* at 462. Industrial Engine then contracted with the plaintiff, Praefke, so that Praefke became an Authorized Service Distributor, or wholesaler. *Id.* Tecumseh provided form contracts to its warehouse distributors for use in contracting with Authorized Service Dealers. *Id.* The form contracts gave Tecumseh the right to approve each Authorized Service Dealer or wholesaler, but also stated that Tecumseh was not a party to the contract. *Id.* The form contracts further stated when the contract between Tecumseh and the warehouse distributor terminated, the contract between the warehouse distributor and the Authorized Service Dealer would also terminate. *Id.* After Tecumseh terminated its contract with

Industrial Engine resulting in the contract between Industrial Engine and Praefke terminating, Praefke sued Tecumseh under the WFDL.

The court concluded Tecumseh did not violate the WFDL. *Id.* at 463. The court reasoned Praefke was not a dealer under the WFDL because there was no contract between Tecumseh and Praefke. *Id.* The court acknowledged the statute allows for a dealership to be inferred, but found no evidence of any intention by either party to enter into a contract with each other. *Id.* Furthermore, the court reasoned it could find no set of facts upon which Praefke could have sued Tecumseh for breach of contract. *Id.*

The Seventh Circuit's reasoning is persuasive and is adopted here. The statute regulates the behavior of a grantor of a dealership. The statute specifies the manner and circumstances a grantor may terminate a dealership. In order for the dealer to receive the benefits of the protections in the statute, the dealer must be the recipient of the dealership created by the grantor. The facts in *Praefke* are sufficiently similar to the facts here. Harley-Davidson and Wolverine have a contract. Wolverine and CAMS are parties to a contract. No evidence has been presented to establish that Harley-Davidson and CAMS ever reached any agreement that might constitute the basis for a dealership. To the extent that Harley-Davidson is a grantor and CAMS is a dealer, Harley-Davidson is not the grantor of CAMS' dealership. Without a contract creating the grantor-dealer relationship, CAMS does not have a claim against Harley-Davidson under the WFDL.

IV. CONCLUSION

Harley-Davidson is entitled to summary judgment on the two claims included in the First Amended Third-Party Complaint. Harley-Davidson has established its conduct was proper and that its actions were justified. Harley-Davidson has an interest in maintaining a brand image. Harley-

Davidson instructed Wolverine to restrict CAMS' distribution of Harley-Davidson branded footwear to means a consistent with that brand image. CAMS has not put forth sufficient evidence to create a genuine issue of material fact that Harley-Davidson's conduct was improper. The evidence CAMS has presented does not support an inference that Harley-Davidson's conduct was motivated by complaints from its dealers about CAMS' conduct. In addition, CAMS cannot maintain an action against Harley-Davidson under the Wisconsin Fair Dealership Law because it has no contract with Harley-Davidson.

## ORDER

Third-Party Defendant Harley Davidson's motion (Dkt. No. 82) for summary judgment is **GRANTED. IT IS SO ORDERED.**


Date:   March 13, 2009                                         /s/ Paul L. Maloney
                                                               Paul L. Maloney
                                                               Chief United States District Judge